UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 12-61280 RK |
| Christopher Paxos | ) | |
| | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor | ) | Judge Russ Kendig |

**Objection of the United States Trustee to Confirmation of Third Plan of Reorganization for Christopher Paxos**

Now comes Daniel M. McDermott, the United States Trustee for Region 9, and hereby submits the following objection to confirmation pursuant to 11 U.S.C. Sections 1128 and 1129 of the *Third Plan of Reorganization for Christopher Paxos* because 1) the plan has not been proposed in good faith and 2) the Debtor has not demonstrated that it is feasible.

**Facts**

1. **Procedural Background:** Christopher Paxos (the "Debtor") filed a voluntary chapter 11 bankruptcy petition on May 4, 2012. A confirmation hearing on the *Third Plan of Reorganization for Christopher Paxos* and hearing on the Motion to Convert or Dismiss filed by the United States Trustee have been adjourned several times and are currently set for hearing on December 5, 2013.

2. On September 7, 2013, this Court entered an *Agreed Order Granting Approval of Third Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, Combined with Notice thereof.* ("Agreed Order re Disclosure Statement") *See Docket No. 154.* The Agreed Order approved the *Third Disclosure Statement for Christopher Paxos* (hereinafter

1

"Third Disclosure Statement") relating to the *Third Plan of Reorganization for Christopher Paxos* (hereinafter "Third Plan of Reorganization")  *See Docket No. 152* (Third Disclosure Statement") and *Docket No. 151* (Third Plan of Reorganization).

    3. **Debtor's Employment, Income, and Disclosures on the Statement of Financial Affairs, Schedules and at 341 Meeting of Creditors:**  On the petition date, the Debtor stated on *Schedule I* that he was a consultant for Branhaven, LLC ("Branhaven") earning $0 a month. *Docket No. 17, p. 17*.  On his *Statement of Financial Affairs*, response to question 1, he disclosed income from employment or the operation of a business in the amount of $0 for the year 2011, and 2012, year to date.  He disclosed other income in the amount of $40,000 described as estimated net earnings from gambling. *Id. at p. 23*.

    4. The *Statement of Financial Affairs*, question number 18, requires an individual debtor to disclose certain business interests and positions including but not limited to businesses in which the debtor was an officer, director or managing executive of a corporation, partner in a partnership, sole proprietorship within the six years immediately preceding the case.  The Debtor made disclosures regarding Precision Powder Coating, Inc., C. Paxos Inc., Metallum, LLC, Minerva Forge, LLC, and Minerva Forging Properties LLC.  indicating each of these businesses had an ending date of 2010.

    5. The Debtor made no disclosure regarding positions held with Branhaven, LLC and Scidera, Inc.  *Docket No. 1, p. 18.*  He made no disclosure regarding ownership of any 12.5 percent notes of MetaMorphix, Inc. on his bankruptcy schedules and the Debtor testified, under oath, at his 2004 examination and deposition conducted by the Office of the United States Trustee that he was never a 12.5% noteholder.  Contrarily, in a signed *Declaration of*

*Christopher Paxos* dated February 22, 2012, signed under penalty of perjury by the Debtor, and filed in the Federal District Court for the Eastern District of Virginia, the Debtor stated he was a 12.5% noteholder of MetaMorphix, Inc. *See, Fred Hutchinson Cancer Research Center, et al, v. Branhaven, LLC et al,* Case No. 3:2011-cv-0710 (E. Dist. Va.), docket no. 77-4, p. 1-3.

6. In response to question number 14 on the *Statement of Financial Affairs* regarding property held for another person, the Debtor disclosed, he had furnishings at his residence in which his wife, Leslie Paxos, has an interest. He made no other disclosures.

7. At his 341 meeting of creditors conducted on June 12, 2012, the Debtor testified that he was employed "as of this month" by Branhaven at a salary of $15,000 a month doing consulting work. He stated he did "operational consulting" for Branhaven. Upon further questions at the 341 meeting by an attorney for a creditor, the Debtor disclosed that he was an interim chief executive officer for an entity called Scidera, Inc., located in Davis, California. He stated that he had been the CEO of Scidera since its formation in August, 2011 and that he had not been compensated for his services. He further disclosed that he would be compensated through his consulting agreement with Branhaven, he did not own any stock of Scidera, and that he did not have any stock options to buy stock of Scidera and he was not owed any money by Scidera. *Transcript of 341 Meeting, p. 39-41.*

8. Upon further questioning regarding his work at the 341 meeting of creditors, the Debtor stated he consults for Branhaven on "operational issues related to Scidera." He also stated an investor group owns Scidera and explained his services are provided to Scidera through Branhaven. *Transcript of 341 Meeting, p. 41-42.* The Debtor clarified, upon questioning, that

12-61280-rk    Doc 198    FILED 11/26/13    ENTERED 11/26/13 09:32:08    Page 3 of 17

Scidera will pay Branhaven for the Debtor's services, and Branhaven will pay the Debtor. *Transcript of 341 Meeting, p. 45-46.*

9. The Debtor testified at the 341 meeting of creditors that Branhaven was located in "Canton, Ohio" and that Elaina Fanno was and had been its CEO since its formation. He stated that Ms. Fanno owns Branhaven and that he was not related to her. *Transcript of 341 Meeting, p. 44.*

10. It is the understanding and belief of the United States Trustee that Branhaven's assets consist of certain assets it bought on behalf of the 12.5 percent promissory noteholders of MetaMorphix, Inc, and MMI Genomics, Inc. from the chapter 11 bankruptcy proceeding of MetaMorphix, Inc., et al., Case No. 10-10273 (Bankr. D. Delaware). The assets consist of intellectual property including various patents. It is the further understanding of the United States Trustee that some of the assets purchased by Branhaven were transferred to Scidera, Inc. and in January, 2013 an entity affiliated with Scidera, Inc. transferred some of those assets to Neogen, Inc. in Lansing, Michigan. At this time, Branhaven's and Scidera's primary if not sole operations consist of defending and prosecuting lawsuits arising from the purchased assets and intellectual property including a lawsuit involving Scidera in which it seeks $7,500,000 in royalty payments for 2011 and each year thereafter. *See generally and Docket No. 4-6, p. 3, Newsham Choice Genetics, LLC. v Scidera, Inc.* Case No. 4: 2012-cv-00563 (S. Dist. Iowa) (arbitration of this matter commenced on November 11, 2013.); *Branhaven, LLC v. Beeftek, Inc. et al,* case no. 11-CV-2334 (Dist. Md.) Mr. Paxos testified that Scidera, under a best case scenario, could benefit upwards of $400 million from such litigation. Notwithstanding, the amount of relief requested and potential benefit to Scidera in the *Newsham Choice Genetics*

4

litigation, Mr. Paxos has indicated in his Disclosure Statement that, other than his salary from Scidera, he "receives no other compensation (other than reimbursement of ordinary travel expenses), and has no written or unwritten agreements or understandings to be given any options or other forms of compensation or to acquire any ownership interest in Scidera or Branhaven." *Third Disclosure Statement, p. 4.*

11. During the course of his chapter 11 bankruptcy petition, the Debtor has reported income of $15,000 a month from Scidera.

12. In response to an objection of the United States Trustee, the Debtor explained in the Third Disclosure Statement that at the commencement of his bankruptcy case, the Debtor anticipated becoming an employee of Branhaven as a management consultant. However, he explained Branhaven was providing management services to Scidera and "decided that it made more sense for the Debtor to be employed directly by Scidera." He further stated "[h]e receives no other compensation . . . and has no written or unwritten agreements or understandings to be given any options or other form of compensation or to acquire any ownership interest in Scidera or Branhaven." *Disclosure Statement, p. 3-4.* The Third Disclosure Statement sets forth on page 3 that Ms. Fanno, the Debtor's girlfriend, owns 75% of the equity in Branhaven.

13. **Ownership and Control of Branhaven:** Although the Debtor has represented that he has no ownership interest in Branhaven, it is the understanding and belief of the United States Trustee that the Debtor has controlled Branhaven since its formation. Pleadings, and transcripts of legal proceedings in other cases in which Branhaven was a party, show that Mr. Paxos over the last several years has held himself out as the managing member of Branhaven, the authorized agent of Branhaven, the president of Branhaven, and the owner of Branhaven. *Fred Hutchinson*

*Cancer Research Center, et al, v. Branhaven, LLC et al,* Case No. 3:2011-cv-0710 (E. Dist. Va.), docket no. 77; *Branhaven, LLC v. Beeftek, Inc. et al,* Case No. 11-CV-2334 (Dist. Md.), docket nos. 36, 67; *See Generally, Metamorphix, Inc. et al, Bankr.* Case No. 10-10273 (Bankr. D. Del.).

14. Schedule C, Profit and Loss from Business, for Branhaven LLC for the years 2011 and 2012, which were produced by Elaina Fanno to the United States Trustee, provide a business address for Branhaven of 7237 Brycewood Circle NW, Canton, Ohio 44720 which is the Debtor's residence. Branhaven operates from the Debtor's home. The Debtor has signing authority on Branhaven bank accounts. Ms. Fanno explained that she formed Branhaven in October, 2010. She claimed that Mr. Paxos was serving in his individual capacity as the collateral agent for 12.5% noteholders of MetaMorphix, Inc. but did not have the time required to work as the collateral agent so he had Branhaven assume such role as collateral agent for the 12.5% noteholders. Notwithstanding, legal documents filed by Branhaven, LLC as collateral agent for the 12.5% noteholders of Metamorphix, are all signed by Chris Paxos for Branhaven, LLC.

15. While Mr. Paxos has not reported any income from Branhaven during the course of his bankruptcy proceeding, Elaina Fanno purchased a 2011 Porsche on or around October 17, 2012 for $86,676. She testified that the funds to purchase the Porsche came from Branhaven. Around May 13, 2013, Ms. Fanno purchased a 2007 Aston Martin for $72,750. She testified the funds to purchase the Aston Martin came from Branhaven. The titles for both vehicles list Elaina Fanno as the owner with an address of 7237 Brycewood Circle, North Canton, Ohio 44720. Ms. Fanno testified that both she and the Debtor drive the cars and that he was with her when she purchased the vehicles. She indicated the Debtor has arranged for insurance coverage

on the two vehicles. The United States Trustee requested copies of current insurance declaration pages along with the amount and source of payment of premiums which counsel have indicated they would provide.[1] Mr. Paxos provided an insurance declaration page reflecting coverage for two Porsches and listing Ms. Fanno as a second owner. Based upon subsequent information provided by counsel for Ms. Fanno, apparently the Aston Martin is uninsured.

16. **Sale of Residence to CNAI and Improvements Upon Property:** On January 10, 2013 the Debtor requested and thereafter secured authority to sell his residence located at 7237 Brycewood Circle, North Canton, Ohio 44720 to an entity owned by his father called CNAI Real Estate LLC ("CNAI") for $750,000. The *Motion of Christopher Paxos to Sell a Parcel of Real Property Located at 7237 Brycewood Circle NW, North Canton OH Free of Any interest of Any Entity Other than the Estate* ("Motion to Sell") disclosed that the buyer, CNAI, is owned by the Debtor's father Nikolas Paxos. *Docket No. 77*. While a *Real Estate Purchase Agreement* and *Residential Property Disclosure Form* attached to the Motion to Sell appear to bear the signature of Elaina Fanno on behalf of CNAI Real Estate, LLC, the Motion to Sell did not disclose that Ms. Fanno has a 1 percent interest in CNAI. Rather, in response to an objection of the United States Trustee, the Third Disclosure Statement was amended on page 3 to disclo**se** in a footnote that **after the Debtor's residence was sold** to CNAI, Ms. Fanno was given a 1% interest in CNAI "so someone would have authority to sign contracts on behalf of CNAI other than Mr. Paxos for work done at the property." The Debtor further noted that Ms. Fanno lives at the

---

[1] It is the position of the United States Trustee that Mr. Paxos is really the de facto owner of Branhaven given his control and involvement in its operations and, as such, he has an equitable interest in the vehicles. While this is not an issue before the court at this time, it is an issue that a chapter 7 (or 11) trustee, if appointed, would have the duty to investigate.

7

property and that she does not pay any expenses for the property or contribute to the household income and that he does not pay for any of her living expenses. [Emphasis added.]

17. Records produced to the United States Trustee by Ms. Fanno state that she purchased her ten units of CNAI on December 20, 2012 (before the Motion to Sell was filed) for services rendered or to be rendered by her to CNAI. The Third Disclosure Statement also provides that the Debtor "has agreed to pay $1,400 as rent to CNAI but there is no written agreement for that amount." The monthly operating reports filed by the Debtor do not reflect any rent payments to CNAI to date and the Debtor testified that he has not made any rent payments during the course of his bankruptcy proceeding and has no set date upon which he will commence making such payments.

18. During the course of this chapter 11 proceeding, substantial renovations and/or work were completed on the residence. Documentation provided to the United States Trustee by Ms. Fanno and the Debtor along with Ms. Fanno's testimony evidence that a total of $55,000 was paid to Bluegrass Inc. by Branhaven for landscaping related services completed at the Debtor's and Ms. Fanno's residence on June 4, 2013; July 1, 2013; and July 29, 2013. Ms. Fanno testified and provided one check showing a payment of $20,000 to Bluegrass Inc. from a Branhaven operating bank account on July 25, 2013. While Ms. Fanno testified that she plans to ask Nick Paxos, the majority owner of CNAI, for reimbursement for such expenses, she has yet to do so.

19. **Proposed Plan:** The Debtor's proposed Third Plan of Reorganization provides, in part, that three classes of unsecured creditors will be paid $50,000 from funds borrowed from Mr. Paxos' father. The Debtor does not intend to allocate any of his future disposable income or

8

12-61280-rk    Doc 198    FILED 11/26/13    ENTERED 11/26/13 09:32:08    Page 8 of 17

earnings towards payment of unsecured creditors. Rather he determined that his available disposable income over five years is $41,000 and that, rather than paying claims from his future earnings, he would borrow $50,000 from his father or his father's entities to pay unsecured creditors. *Third Disclosure Statement, p. 5. See para. 27 below.*

20. The Third Plan of Reorganization proposes that approximately $8.8 million of unsecured claims will receive a pro rata share of $50,000. Specifically, Class 3 unsecured claim of Spirit in the amount of $1,075,087 (unless it is held non-dischargeable or settled); Class 4 unsecured deficiency claims totaling approximately $6.9 million; and Class 5 unsecured claims in the amount estimated at $870,057 shall be paid $50,000 pro rata in one sum from funds borrowed from the Debtor's father or entities he owns.

21. The Third Plan of Reorganization also provides that administrative claims estimated at $30,000 will also be paid from other borrowed funds. Tax claims including the claim of the Internal Revenue Service in the amount of $393,307.37 to which the Debtor has objected may be paid "from the Debtor's disposable income, tax refunds (if any) or other borrowings if necessary." *Third Plan of Reorganization, p. 2.* In the event the claim of Spirit in excess of $1 million is deemed non-dischargeable, the Third Plan of Reorganization provides that "it will be paid by the Debtor from funds other than the Borrowed Funds."

22. Depending on the allowed amounts of the tax claims and whether Spirits' claim is deemed non-dischargeable, the Third Plan of Reorganization could require the Debtor to borrow as much as approximately $1,480,000 over the term of the plan to fund required plan payments. The Third Amended Plan details that the $50,000 lump sum payable to unsecured creditors shall be borrowed from the Debtor's father. The Third Plan of Reorganization does not detail the

9

source of other borrowed funds or indicate whether the Debtor has actually secured a loan to make any other such required payments. The Debtor did testify at a 2004 examination and deposition conducted by the United States Trustee that all borrowed funds will come from his father.

## Law and Analysis

23. Bankruptcy Code Section 1129 sets forth the requirements for plan confirmation. The burden of proof rests upon the plan proponent, in this case the Debtor, to demonstrate that each of the requirements delineated in Section 1129 for confirmation is met. *In re Kemp,* 134 B.R. 413, 414 (Bankr. E.D.Cal. 1991). Such requirements include, but are not limited to:

> (3) The plan has been proposed in good faith and not by any means forbidden by law.
>
> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

24. **Good Faith:** The Bankruptcy Code does not define good faith. However, in relation to confirmation of a chapter 11 plan courts have held a plan to be proposed in good faith "if there is a reasonable likelihood that the Plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of South Dakota,* 828 F. 2d 1310, 1315 (8th Cir. 1987) (reversed on other grounds). It is within the bankruptcy court's discretion to look to totality of the circumstances of a particular case and determine "whether the plan will fairly achieve a result consistent with the Bankruptcy Code." *In re Madison Hotel Associates,* 749 F. 2d 410, 425 (7th Cir. 1984).

10

> In its most basic sense, 'good faith' means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage. BLACK'S LAW DICTIONARY (9th ed. 2009)

*In re Friedman,* 2012 WL 5409194 (Bankr. D. Ariz. 2012) (concluding plan of individual debtors was confirmable after finding it met the requirements for confirmation noting that debtors established they properly valued equity interests in businesses and objecting party did not present evidence to dispute valuations.). "…the failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith because such conduct frustrates this objective." *In re Walker,* 165 B.R. 994, 1001 (D.Ct. E.D. Va. 1994) *citing, In re Kemp*, 134 B.R. 413 (Bankr. E.D. Ca. 1991) (plan was not proposed in good faith where debtor provided for payments to ex-wife on judgment that were significantly less than his net income.) *See also In re Osborne,* 2013 WL 2385136 (Bankr. E.D.N.C.).

25. The good faith requirement in Section 1129 is a condition to confirmation. Even if all creditors accept the plan, the court must still find the plan was proposed in good faith. *In re Weber,* 209 B.R. 793, 797 (Bankr. D. Mass. 1997) (citations omitted) (court provided debtor chance to amend plan after confirmation denied where plan allowed debtor to live extravagant lifestyle upon objection of United States Trustee.)

26. The facts of this case demonstrate the Debtor has not proposed the Third Plan of Reorganization in good faith. The Debtor is not contributing any of his disposable income to pay unsecured creditors. With borrowed funds, the Debtor proposes to pay up to approximately $8.8 million (including Spirit's claim) of unsecured claims $50,000. This amounts to a distribution

of about .0057 percent. If Spirit's claim is deemed non-dischargeable and paid from other funds, the distribution may be slightly greater.

27. The Debtor's projections show net disposable income of $41,000 over five years. The projections assume that the Debtor will pay rent of $18,000 a year and home maintenance costs for repairs and upkeep of $6,000 a year. However, he does not have a written lease or rent agreement. Other than a payment to Bluegrass, Inc. of $2,619 on March 6, 2013, a plumbing related payment and repair on a gate, the Debtor's operating reports and testimony do not support that he is likely to make any rent or home maintenance payments in the future. In addition, Ms. Fanno earns $3,000 a month also as an employee of Scidera. Her testimony and operating reports filed by the Debtor suggest that she does not contribute to the household expenses but the Debtor provides for, at least, a portion of her support. Moreover, the monthly operating reports and testimony of the Debtor show significant amounts of expenditures for restaurants, clothing, landscaping and other items that could easily be reduced and provide for a greater return to unsecured creditors.

28. Notwithstanding the thousandth of a percent proposed repayment to unsecured creditors, the Debtor's live-in girlfriend has managed to purchase an Aston Martin for $72,750 and a Porsche for $86,676 from funds from Branhaven which, as set forth above, has been operated and controlled by the Debtor. Branhaven's additional payment of landscaping expenses totaling $55,000 paid back in June and July, 2013, which have yet to be reimbursed by Nick Paxos, also raise questions as to whether such funds will in fact be reimbursed or rather whether Branhaven is being used as an indirect source of income for the benefit of the Debtor.

12

29. While the Debtor has indicated in the Third Disclosure Statement and testified that, except for salary from Scidera, he has no written or unwritten agreement with Branhaven or Scidera for any other forms of compensation, options, or equity in this entities, such statement is suspect when the Debtor's, general business background is considered, along with his positions and involvement with these entities and the amount of potential funds that could be won by Scidera and/or Branhaven from pending litigation.

30. Finally, the Debtor's failure to disclose in the Motion to Sell that Ms. Fanno also had an interest in CNAI, along with the other facts noted above, demonstrates the Debtor's lack of honesty and transparency in this bankruptcy proceeding. These facts, in totality, demonstrate that the Debtor's plan has not been proposed in good faith.

31. **Feasibility:** A plan is feasible if "confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization . . . ." 11 U.S.C. Section 1129(11). This means that a proposed plan must be "realistic" and provide a "workable framework for reorganization." *In re Walker,* 165 B.R. 994, 1005 (Dist. Ct. E. D. Va. 1994) (plan did not meet good faith or feasibility requirements where debtors' plan funding was from sale of real estate with no set terms of sale or time frame for sale.) A plan that is dependent upon financing cannot be confirmed unless "there is an adequate evidentiary showing that such refinancing is likely to occur." *In re Seasons Partners, LLC,* 439 B.R. 505, 515 (Bankr. D. Ariz. 2010).

32. The plan proponent has the burden of showing "a reasonable probability of success, not that success is inevitable." [Citations omitted]. *In re Melcher,* 2006 WL 6810966 at *8-9 (9th Cir. BAP(CAL)).

13

33. The Debtor in this case has failed to demonstrate that the plan is feasible. The proposed Third Plan of Reorganization, depending on the amount of allowed tax claims and treatment of Spirit's claim, could require the Debtor to borrow more than $1.4 million over the term of the Plan. The Third Plan of Reorganization provides that $50,000 of such funds will come from funds borrowed from the Debtor's father or other entities which he owns. However, it is vague and uncertain as to the source and actual availability of the balance of the remaining funds that may need to be borrowed. Quite simply, given the significant amount of funds that the Debtor may need to borrow under the terms of the Third Plan of Reorganization, the Debtor must demonstrate that he will actually be able to borrow such funds and set forth the source of those borrowed funds.

## Conclusion

Based upon the foregoing, confirmation of the *Third Plan of Reorganization for Christopher Paxos* should be denied.

**Wherefore**, the United States Trustee requests this court to enter an order denying confirmation of the *Third Plan of Reorganization for Christopher Paxos.*

                                      Respectfully Submitted,

                                      Daniel M. McDermott
                                      United States Trustee
                                        Region 9

By:    */s/ Amy L. Good*
        Amy L. Good (0055572)
        Trial Attorney
        U.S. Department of Justice
        Office of the U.S. Trustee
        201 Superior Avenue, Suite 411
        Cleveland, Ohio 44114
        (216) 522-7800 ext. 236
        amy.l.good@usdoj.gov

## Certificate of Service

I certify that on November 26, 2013, a true and correct copy of the foregoing Motion was Served:

Via the Court's Electronic Case Filing System on these entities and individuals who are listed on the Court's Electronic Mail Notice List:

- Emily C. Barlage    ebarlage@frantzward.com, dlbeatrice@frantzward.com
- Edward J Boll    nohbk@lsrlaw.com
- Edward J. Boll    nohbk@lsrlaw.com
- Carrie M Brosius    cmbrosius@vorys.com, dmkamp@vorys.com
- John A. Burnworth    jburnworth@kwgd.com, mhelmick@kwgd.com
- David E Butz    dbutz@kwgd.com, mhelmick@kwgd.com
- David E Butz    dbutz@kwgd.com, mhelmick@kwgd.com
- Jeremy M Campana    jeremy.campana@thompsonhine.com
- Thomas R Houlihan    Houlihan@amer-law.com, crogers@amer-collect.com;rschroeter@amer-collect.com;thoulihan@pacernotice.com
- Melissa A. Jones    mjones@frantzward.com, dlbeatrice@frantzward.com
- Scott A King    scott.king@thompsonhine.com, diane.macleod@thompsonhine.com;mary.romanak@thompsonhine.com
- Jennifer L. Maffett    thdaytonecf@thompsonhine.com, jennifer.maffett@thompsonhine.com
- Michael J O'Shea    michael@moshea.com, ron@moshea.com;vgreene@motleyrice.com;jsargent@motleyrice.com
- Beth Ann Schenz    bkecf@huntington.com
- Frederic P Schwieg    fschwieg@schwieglaw.com
- John W Solomon    jwsolomon@vorys.com, sasiciliano@vorys.com;mlteuscher@vorys.com
- United States Trustee    (Registered address)@usdoj.gov
- Elia O. Woyt    eowoyt@vorys.com, eowoyt@vorys.com
- Maria D. Giannirakis ust06    maria.d.giannirakis@usdoj.gov
- Amy Good ust08    amy.l.good@usdoj.gov

And by regular U.S. mail on November 26, 2013, postage prepaid, on:

Chris Paxos
7237 Brycewood Circle
North Canton, Ohio 44720

John F. Anthony, II
Stark County Treasurer
110 Central Plaza S
Ste 510
Canton, OH 44702

Anthony DeGirolamo, Esq.
Courtyard Centre Suite 307
116 Cleveland Avenue NW
Canton, Ohio 44702

                    by:    */s/ Amy L. Good*
                            Amy L. Good (#0055572)
                            Trial Attorney
                            Office of the U.S. Trustee
                            H.M. Metzenbaum U.S. Courthouse
                            201 Superior Avenue East, Suite 441
                            Cleveland, Ohio 44114-1240
                            (216) 522-7800 ext. 222
                            Amy.l.good@usdoj.gov